May it please the court, my name is Michael King and I represent the defendant and appellant Asten Johnson. With me at council table is Mary Spillane, who represents the defendant and appellant Scapa Dryer Fabrics, and with her gracious assent I will be presenting the argument on behalf of both of our clients today. In this product's liability case, the plaintiff's claim that asbestos from our client's products substantially contributed to plaintiff Henry Barabin's mesothelioma. We are here today first and foremost because the district court, during the trial of this claim, failed in its Daubert gatekeeping responsibilities. The court did not so much abuse its discretion under Daubert as it didn't exercise that discretion at all. Instead of assessing the reliability and relevance of proffered expert evidence before allowing the jury to hear that evidence, as required by Daubert and this court's precedence, the district court adopted a gates-wide-open philosophy, granting the parties the freedom to present a wide array of expert evidence in order to, again the court's words, allow both sides to try their case as much as possible. Well, the district court did make a reliability determination in response to the motions in Lemonay. No, Your Honor, the district court did not make a reliability determination. The district court didn't make a reliability or relevance determination concerning any of these experts. I think there are four critical points in the record that you want to go to in order to see the extent to which the district court adopted this gates-wide-open philosophy. The first point is during the motion in Lemonay hearing, it's the transcript that we reproduced at A.S.E.R. 44 and 45. Let me just stop you and ask you to turn to E.R. 70, which is part of the order on the motions in Lemonay. Yes. And where the court goes through the arguments about Mr. Millett's testimony and responds specifically to the argument that, and then same with Cohen's testimony, responds specifically to the argument that these experts do not meet the Daubert standard. So I don't understand your comment that there's no reliability determination. I understand that you totally disagree with it, but that's different than saying that the district court never focused on that question. Well, the district court focused on the question but then didn't make the determination. Let's look at E.R. 71 where Millett is discussed. And at the bottom of that page, this is page 12 of the order of the motions in Lemonay, the court says it's troubled by the marked differences between the conditions of Dr. Millett's test and the actual conditions. In view of this concern, the court generally finds that Dr. Millett's test and corresponding testimony are admissible with the restrictions imposed by Judge Armstrong in the previous case. That's Sharon Armstrong who at that time was the chief asbestos judge for King County Superior Court here in Seattle. And that involved a limiting instruction. But, Your Honors, it breaks down when you actually get into the trial. You have to look at E.R. 212, which is R.T. 1150, because then the issue of extrapolatability. 212, that's your? 212. That's where the issue of extrapolatability comes to a head. And there's an objection when Dr. Millett tries to represent that he's replicating conditions. And the court says, I've already said to you, he's talking to the jury now, there is no way to replicate it in the lab conditions that Dr. Millett is going to describe. He can try to do something that he may feel helps him extrapolate from that. The other side will say why they disagree with that. You ultimately decide what to do. Yes, all that does is say, I've decided this is admissible for what it's worth. But he's already decided that it's admissible in the earlier order. I guess I don't understand. Well, deciding that it's admissible doesn't mean that the trial court has necessarily gone through and actually done a reliability and relevance determination. He's just told the jury it's up to them to decide extrapolatability. The jury can't decide extrapolatability, Your Honor. Under Schuttle, extrapolatability, when you're talking about something like a glove box test, has to be a determination by the trial court. There is that preliminary threshold determination under which there has to be a scientifically valid basis for extrapolation. May I ask you? Yes, Your Honor. Was there an actual Daubert hearing in this case? Because typically there is a one, two, ten-day hearing where the experts come up and testify about their methodologies and how they came to their decision. Was there such a hearing in this case? No, there wasn't a hearing as such. There was extensive briefing. All of the issues that we've identified in our briefing. You have not assigned as error the failure to hold a hearing. No, I wouldn't do that because, for one thing, the issues were thoroughly fleshed out on the paper. I was just curious. I didn't say one way or the other. I just was curious as to how this all happened. Yeah, and we're not assigning error to the fact that there wasn't a hearing. But we are contending that what the trial court did here was after looking at the issues, the trial court simply said, I'm going to admit the evidence. Well, if we disagree with you in your assertion that there was a procedural error, that is if we conclude that the district court cited Dawbert, understood what Dawbert said, and simply disagreed with you on the merits, what's our standard of review for the substantive decision? Is it abuse of discretion? Well, you would be dealing with abuse of discretion, but then the secondary problem would be that we don't have an analysis of the Dawbert factors. We do not have specific findings as to what makes this evidence scientifically reliable. Is that required? Yes. By what case? I think Mukhtar makes very clear that you can't just say it's in and cite Dawbert, and that's the end of the analysis. District court judges got to do more than that. Otherwise, you're left with no rationale, no explication of the factors, no demonstration of a considered exercise of discretion. But that's not what happened here. If we agree with you that, you know, it happened the way you say it happened, in other words, there was no gateway determination by a district judge, do we review that error to see whether it was harmless or not, or is it just like an automatic reversal? You would, if you decide that there was error, there was a failure to do Dawbert gatekeeping, then the burden shifts under Obrey, a decision I think, Judge Graber, you were on that panel, which sort of cleared up the situation with harmless error. And the burden shifts to the plaintiff, and the plaintiff has to come forward and persuade you that more likely than not there was no prejudice, that this trial would basically have come out the same way. You mean the proponent of the evidence. Exactly, the proponent of the evidence. Now, I do want to emphasize that the mere recital here of, I looked at Dawbert, and I've decided to admit the evidence. I don't think, given the totality of the evidence in the record about this judge's philosophy, constitutes a demonstration that it was actual gatekeeping. Well, let me just continue on the path that Judge Tashima has started, which is, what if we agree with you, what do we do? Wouldn't one option be to remand for the limited purpose of a more complete Dawbert analysis, and if the Dawbert analysis came out in favor of the proponent of the evidence, the result of the trial would stand. And if it came out the other way, then there would be a new trial. Or there would be a determination that without the evidence, what remains of the plaintiff's case is legally insufficient, and under Weissgram we would get a judgment as a matter of law, and we wouldn't have to go through a new trial. What does Mukhtar say about what happens if there is an inadequate Dawbert hearing? That's the case you relied upon. Right. Well, Mukhtar said, and in that case you just had a blank statement, evidence is in. And Mukhtar said, well, then we're sending it back for a hearing. Mukhtar didn't say, we have to send it back for a hearing. Mukhtar just said, we're sending it back for a hearing. You don't have to send it back for a hearing. You can make this decision. Dawbert, too, is the illustration of that. Good Lord. So you're saying we could do this in the first instance? Yes, you could. And let me talk about Dr. Millett, because I think the clarification of the issues here demonstrates why that would be an appropriate course, although certainly I would be happy to have this case go back with some very clear instructions to the trial court. Look, you need to look at the reliability factors. Here's how it relates to Millett. You need to look at the relevance factors. Here's how it relates to Millett. But let's talk specifically about Millett in light of the clarification of the causation theory, because the plaintiffs have admitted in their brief that, in fact, at the very least they are acknowledging, this is Dr. Broadkin's testimony, this is RT-910 and those two questions. He's admitting that you can't treat as causative occupational asbestos exposures that didn't exceed ambient range. Well, the only evidence in this record from which they arguably can make the claim that there was an exposure in excess of ambient range is Dr. Millett. Well, then look at Dr. Millett. I was referring earlier, Your Honor, to the question of extrapolatability. Schuttle is on point. Schuttle says that if you've got something that's been done in a lab, you have to have a scientifically valid basis for extrapolatability, otherwise the evidence is gone. Well, we know from this record, and the trial court had this explained, and the trial court doesn't discuss this, Your Honor, which I think is an indication that there really wasn't true Daubert gatekeeping conducted here. In order to have a valid extrapolatability for this kind of glove box test, you've got to go through a series of protocols. The EPA has laid them out. And one of the final steps is you need to do modeling and you need to verify your results. Well, it's admitted that wasn't done here. There was no modeling. There was no full-sized felt used in a mock-up plant of the sort that was done with Western Michigan. Well, that is an admission that you don't have valid extrapolatability. That takes care of reliability right there. And you've got to have evidence that's both scientifically reliable as well as relevant. You've got to have a fit. Well, how about looking over at the fit side? We have a series of factors we've outlined in our brief, several of them. It isn't denied that our description of any of those is inaccurate. It isn't denied that all of those factors, the design of his glove box, his poor glove box methodology, resulted in a distortion that produced releases that were unlikely to have happened in a real-world plant and produced quantities of releases that were unlikely to happen in a real-world plant. I'll just mention one of them. And that's this whole question of the direction of using the air compressor. In this glove box test, Dr. Millett acknowledges that he takes a small sample of felt. It's about the size of your hand. I'm not making up this size reference. He acknowledged that as much when he was being cross-examined, that these samples are the size of the hand. Five inches away, he blasts away perpendicular, 90-degree angle at this felt for five minutes. Well, that's not the way it works. Mr. Barabin, RT444ER308, described that when he was dealing with paper break blowdowns, the goal was to blow the remaining paper fragments out of the machine. You don't get something out of the machine by blasting straight on. And then we have the evidence from the Western Michigan report, which showed that if you blew straight on the way Dr. Millett did, well, you would get release of fibers. But if you corrected and blew at an angle across the fiber, you got no release. Dr. Millett has a test that has all these fit problems. They're established by this record. The plaintiffs put their best foot forward. They were not able to refute these. Dr. Millett admitted to all of these problems that are identified, secondly and independently. Dr. Millett did not follow the established EPA protocols. The record shows these have been around since 1985. They aren't a one-shot deal. They're a protocol that are designed for testing products in a circumstance like this to see if they release dangerous substances into an environment. What was the explanation given? Well, I couldn't test in a mill because they don't have them in a mill anymore. Well, that's fine. That's an explanation for why you decided not to follow the protocols. But it's not an excuse for admitting this evidence. And without Dr. Millett's evidence, which plainly should not have been admitted, this is not a close call. It does not have to go back, although if you send it back with clear guidelines, I mean, we certainly would like to have a second shot at this. Without that evidence, the only evidence in this record, and this is the testimony of Wendlick and Carlson, who are talking about not litigation performed tests in plants, but stuff that was done for purposes of health and safety requirements at Weyerhaeuser in the 1970s, at the Camas plant in the 1970s, and continuing in the 1980s. And that evidence showed that the only time when felts might produce a release of asbestos fibers was when you were taking a used felt. It had reached the end of its useful life. These things got replaced every one to two weeks. And if there happened to be asbestos in them, and remember, most of these felts on most of these machines didn't have asbestos, but if you happened to have asbestos in them and you took it away and disposed of it, replaced it with something else, that process would result in a release of fibers of 0.01 fibers per cubic centimeter. That's ambient range. That's a level at which Dr. Brodkin, their top expert, admits, well, I've got to take those off the table. They're not causative. Now, I see I'm getting into my rebuttal time, and I would like to wrap up this specific point by pointing out that when the plaintiffs submitted their case to the statute from 1980, and I circulated a responsive letter yesterday. You may have had a chance to see it. What's critical about that is it shows that from 1980, during the course of the ensuing school asbestos abatement program, the EPA came to the conclusion that it was safe to let schoolchildren to go back into school if you could get the asbestos level in the atmosphere down to 0.01. Now, they have been arguing, oh, there's no safe level, so we're entitled to, even if we don't know the quantity released, even if it may be greater than ambient, we're entitled to say, as a matter of good science, that you should just deem all of those exposures a substantial contributing factor. This makes no sense, given the state of science. If 0.01 is safe for kids, 0.01 is safe for workers, too. And the contrary ipsy-dixit contention of these experts should never have been allowed to go to the jury. And if there are no further questions, I will reserve the balance of my time. You may do so. We'll hear from Mr. Talmadge. Good morning. May it please the Court, Phil Talmadge here representing the Barabans. I'm joined at council table by my colleague, Sid Tribe, from my office, and James Nevin, as well as Bill Purcell. Henry Baraban worked for Crown-Zellerbach for 33 years, many of which involved direct contact with paper-making machines that used asbestos-containing dryer felts, manufactured by the defendants. He cut those felts. They were dragged across the floor, the old felts. They blew out the machines where fibers entered the air. All of these activities released respirable fibers into the air that he breathed. He contracted the invariably fatal asbestos-related disease of mesothelioma. Do you agree that the district judge did not make a Daubert gateway determination? I think, Your Honor, that's an absolutely untrue statement on the part of counsel and on the part of the defense. When did he make it? Your Honor, he made a Daubert ruling in connection with the motions in Lemony. If you look at the ruling on excerpt of record page 71. Page 71. Go ahead. See where the judge made that determination about Daubert. But under Mukhtar, at a minimum, the judge has to make a reliability determination. So where in that ruling did he make a determination on reliability? It was not only there, Your Honor, but I was going to say, in connection also to excerpts of record 90 to 100 with respect to summary judgment. And certainly in detail, Your Honor, with respect to the post-trial motions at excerpts of record pages 12 and 13 and 27 through 30. Okay. So just show us in one place where the judge said this evidence is reliable. That's the ruling that Mukhtar said has to be made. He said it was admissible. Correct. But I'm looking for where he said it's reliable. So would you point us to the page where the judge said this evidence is reliable? I think you can extrapolate from his statement at excerpt of record page 71 that the testimony was reliable from time to time. Give me some specific language. I mean, how close does he come? What line on page 71? I think, Your Honor, I can certainly speak to that. He speaks to the Daubert test. There was certainly extensive briefing in this case. Yes, but what does he say about reliability? Defendants contend that Dr. Millett's test failed to meet the Daubert standard. I'm on the first line. Okay. Specifically, they maintain that the tests are unreliable because they're not generally accepted in the scientific community and irrelevant because they will not be helpful to the fact finder given the disparity between his testing conditions and the actual conditions at the Camas Mill. And then he goes on to say. That was the argument of the defendants. That was their argument. This is not reliable. And he rejects it, Your Honor, in saying in view of the concern, the court finds that Dr. Millett's test and corresponding testimony are admissible. Are admissible. That doesn't say they're reliable. But he acknowledges the reliability concern, Your Honor, and answers it by saying that the testimony is admissible based on that reliability. That was a dodge by the district court to just let it in. He said it's admissible but didn't make a determination as to whether it's reliable. And Mukta says the district court has to explicitly determine that the expert evidence is reliable before it can be admitted. But you can't dodge it just by saying it's admissible without making that determination. I don't believe he dodged it, Your Honor, because the issue was raised in the motions in limine. It was raised on summary judgment by the defendants. It was raised in motions to dismiss under CR 50. It was raised in post-trial motions under CR 50 and for a new trial under 59. And the judge answered those questions of reliability in each one of the orders. He believed that Dr. Millett's testimony was reliable for those reasons and repeated himself. It would have been easy to say that. It would have been easy to say that. It's normally said explicitly. And Mukta is very strong on that point. It is, but it says that the district court has broad discretion in deciding how reliability issues are to be treated. Certainly, there's no requirement of a hearing, as you had asked about. There's no requirement here that there be a hearing. In fact, in this case, there was an opportunity in each one of these instances for the judge to address the issue, and he did. And I think that's the bottom line. He addressed the issue. I was a district court judge, and I conducted these hearings. I mean, it's really easy to just say the science is there. It's reliable. The credentials are there. It's just really difficult for me to understand why a judge wouldn't just do that. This was a 14-day trial in which the issues came up all the time. They came up in pretrial motions. They came up in post-trial motions. They came up during trial, and the judge addressed them. This judge addressed the issues carefully. He limited, for example, Dr. Millett's testimony regarding his glove box test and the scope of it, and noted that it was something not conducted under precise conditions of a mill but conducted in a lab. It was something that, of course, the defendant's own experts did as well, since we don't have asbestos dryer felts in the mill set. If the court were to conclude that the district court didn't make sufficient findings, what would be the result? Your Honor, I think, of course, the court could remand this, as the court suggested to the district court, for more specific findings in this, but I don't think the court even needs to. If you look at the circumstances here, for example, of Dr. Millett's testimony, what counsel wants to gloss over immediately is the only peer-reviewed test of asbestos for dryer felts in the mill setting was performed by Dr. Millett. Pretty reliable. You have a circumstance that Dr. Hammer, the defense's own causation expert, had Dr. Millett write the chapter in his book on asbestos, on asbestos testing. Their own expert thought that this Dr. Millett was particularly capable of doing asbestos testing, and he did the kind of asbestos testing that people do in determining whether or not there was a release, and determined, contrary to all the numbers that were thrown about here, and note that the district court here spoke in terms of a substantial causative factor as a qualitative exercise, not a quantitative one. His testimony was that the presence of asbestos fibers in this particular environment for Mr. Barabin, under the particular circumstances in which he was involved in the Camas mill, was 100 million times the ambient level. It was a large amount of asbestos that was spewn into the air and breathed in by Mr. Barabin in the course of his 33 years on the job with this employer. There are a number of other circumstances here, and one of the problems we have in the case is a whole series of statements and issues thrown out in the hopes that something's going to stick, notwithstanding that this was a 14-day trial. We have their own expert, Dr. Hammer, who basically undercuts their whole theory of this case in so many different respects. There is no safe level of asbestos exposure, and even a brief exposure of a low concentration can result in mesothelioma. Dr. Hammer so testified. Meso is a dose-related disease. Dr. Hammer so testified. Crystatile asbestos, something they claim as, well, it's not really all that serious, it causes mesothelioma. And certainly, more importantly than anything else I think here, Dr. Hammer testified, as well, that any exposure to asbestos above ambient levels can be a causative factor, which is precisely the testimony of Dr. Brodkin in this case. Their own causation expert confirms the testimony of our causation expert on the key issue. They try to repudiate his testimony. If you look at the reply brief at page 18, note 5, but they have a very difficult time repudiating the science that their own causation expert demonstrated with respect to Dr. Brodkin. I think, as I understood Counsel's argument, he agrees that the standard is whether there's anything more than ambient, but he disagrees that Dr. Millett's assertion that there was more than ambient is scientifically reliable. That's how I understood his argument. Your Honor, I think that's incorrect. I think they dispute both. They argue that you have to identify with such precision the scope of causation here, that the proposition that any exposure above ambient level is causative is something they vigorously dispute. They repudiate their own expert's testimony. Okay, I understood. Maybe Counsel can clarify that when he gets up for rebuttal, because I understood his opening argument to agree with you on that point. Well, I hope that they're agreeing with us on that point, but I don't think they have historically in their briefing. I think what they've said all along is they dispute Millett's testimony as an appropriate basis for the decision on causation here, but they also dispute the proposition advanced by Dr. Brodkin, and this is why they're claiming that there needs to be a Daubert reliability test about Dr. Brodkin, that any exposure above ambient levels is causative in terms of mesothelioma. What about the other piece of that, though, their argument that Dr. Millett's assertion that there is more than the ambient amount is not scientifically reliable because it relies on extrapolations? Your Honor, that argument is a novel one, to say the least. Let's take just a general proposition. Albert Einstein promulgated his general theory of relativity in 1905. You probably couldn't prove the general theory of relativity in terms of the release of energy by the usual equation of E equals MC squared until somebody actually did the kind of atomic testing that occurred during the Second World War in the 1940s, but it didn't mean it wasn't good science. Scientists extrapolate from a proposition all the time. Here you have an individual who is the only person who's written a peer-reviewed article on drier felts and asbestos exposure in the mill setting, the only person who's done that kind of writing. You have an individual that their own expert thought was really a significant guy in terms of the ability to do testing, writing the chapter in his book on asbestos exposure about asbestos testing, and he conducts the tests. He does the tests in a lab setting. Ironically, their expert, Lee, is someone who conducts a similar kind of glove box test, albeit on a slightly larger scale, but it's still the same basic science. But the judge did say he was troubled. He did. But he was troubled, and that's what makes the lack of a reliability determination more striking in this case, because the judge expressly articulated his concern about the conditions under which the test was performed. I think he did, but he appropriately cautioned the jury at 1149-1150 in the reporter's transcript about these issues. The judge was sensitive to that, and he basically gave the defendants that particular cautionary instruction to the jury. So he was concerned about it, and he gave them the cautionary instruction. The point here is what the defendants are really asking you to do is transform Daubert into something that it isn't. Daubert is designed to not put the district court in the position of saying, this is the best science, this isn't the best science. It's put in the position of saying, is this science generally reliable? And the point I'm pointing out here, Your Honor, is that in terms of Dr. Millett's test, basically how he approached it, it was perfectly appropriate science. He tested these materials himself. He's the guy that wrote the book on testing. If the judge had said that, we wouldn't be here. If the judge had made that determination that, you know, this is the appropriate science, it's state-of-the-art, it's peer-reviewed, it's acceptable in the scientific community, we'd be fine. And I understand that, Your Honor. That's given them the only opening they have after a 14-day trial in which they haven't complained about a single jury instruction. They haven't complained about the order in limine. They didn't assign error to it. They haven't complained about a variety of things. Well, they did complain about a couple more things that weren't argued. Yeah. They've complained about post-trial matters relating to the jury and they're concerned about the order. Oh, they also complained about the collateral source rule. They have. A strict rule that says... So, I mean, all I'm saying is this is not the only thing they complained about. Well, they've complained about a variety of things around post-trial motions that they've walked away from, certainly. But I think the point here in terms of these witnesses is the court can look at them and could determine on its own that they're reliable if the court feels the need to have the... Can we do that? If the district court doesn't make a Dauber determination, can we make it? I think you could look at it in terms of a harmless error kind of analysis. If there was any error in failing to say specifically that there was reliability here, you could remand it to the district court for its consideration or you could make the decision yourself based on the record that's developed here. So it's not... Go ahead. No, go ahead. Well, that's not the usual harmless error inquiry, though. I mean, you know, to make the determination yourself. The usual harmless error inquiry is given this error, did it affect the trial, right? Isn't that what the inquiry is? It's not, you know, well, you know, let's make the decision for the district judge. But we don't think based on this record you can conclude anything other than that these witnesses were reliable based on the arguments... But I'm talking about your suggestion that we could make the reliability determination in the place of the district judge. Well, both parties are suggesting that we do that. And it sounds like you're both doing it on the ground of harmless error. That is, if it was error not to make more explicit findings, each of you thinks that there's only one possible answer if the district court had looked at it. You think that it's obvious that they would have had to find it reliable and therefore everything stands. Your opponent says it's obvious that it was unreliable and then therefore everything goes away. I think we're looking at the district court made a ruling. He admitted the testimony of these experts. But Ellis says, our case in Ellis says, admissibility is not the same as reliability. Your Honor, if the court deemed it appropriate to remand to the district court for further findings in this point, that would certainly be an appropriate approach. I'm simply pointing out here that with respect to the experts that we're talking about, they've raised three experts that they're concerned about. They've been concerned about Dr. Brodkin. Dr. Brodkin's basic science was confirmed by their own expert. Dr. Hammer basically agreed with Dr. Brodkin. Their own expert said the science was perfectly appropriate and agreed with him. And, of course, when Dr. Hammer was presented with a hypothetical that included the testimony of Dr. Millett and Mr. Cohen that had not been given him to form his expert opinion, he agreed that Mr. Berubin's exposure was causative. That's a very significant factor in terms of Dr. Hammer's testimony. With respect to Dr. Millett, we've pointed out again his testimony. He's the guy that wrote the book on asbestos testing. His testing was consistent with the science, the approach to testing that was done by their expert. We don't weigh the expert testimony in terms of who's stronger, who's not stronger. All we're saying is that the district court had the initial obligation to make sure that all of the experts were coming from a place of reliability before they even testified. And the plaintiffs in this case, Your Honor, agree with that aggressively. The point, I think, here is if you read the briefing submitted by the defendants in this case, what they're asking you to do is to pick and choose who the winners in terms of the science are in this case, rather than looking to the question of was the science, the basic analysis, reliable, subject to appropriate cross-examination, which, of course, took place in this case. And I would point out, finally, with respect to Mr. Cohen, there was a lot of complaint about his testimony regarding fibers being in the air and re-entrainment is the term that was used. The district court pointed out that his testimony was essentially uncontradicted, that fibers, once released into the air, essentially stay in the air. That's an excerpt of Record 28 and 29. In fact, the testimony, very common throughout all of the asbestos exposure cases in Washington State, beginning with Lockwood and leading through the Morgan case, speak in terms of expert testimony that speaks to fibers being in the air and that those fibers can be breathed in by a plaintiff. But that's the reason the Daubert hearing is so important, because once somebody is introduced as an expert, the jury gives their testimony a great deal of credibility. And so that sort of begs the question to me, that their testimony was so powerful. Well, my point, Your Honor, is not saying that their testimony was powerful. What my point is saying is that their testimony was reliable. The notion of fibers being in the air and being breathed in being something that was novel, it's not. That's something that they didn't contradict below. And certainly the point about Dr. Brodkin's testimony, the core issue about whether or not any exposure above ambient exposure being causative, is something that their own expert agreed with. So the basic science of his testimony was something they agreed with. And, of course, Brodkin's testimony was far beyond that in terms of his understanding of what Mr. Berubin actually experienced, what he actually breathed in, in the way of asbestos fibers when he was on the job, dragging huge dryer felts with asbestos in them across concrete floors, blowing these machines out where asbestos was being used, cutting asbestos materials, dryer felts that had asbestos in them, and releasing fibers into the air. He was exposed to all of that in the course of his employment, and that's what Dr. Brodkin testified to. The point here is these experts I think were reliable, but if the court feels the need to have the district court make a further determination about reliability, I think the district court will find it, and based on this record, it would be well within the district court's discretion to do so, based on the evidence that was submitted. We believe that based on the order on summary judgment, the order on the motions in limine, the post-trial motions where Judge Lasnik went through all of the materials in great detail, he determined that these experts' testimony was reliable, albeit with the cautionary instruction that he gave regarding Dr. Mallette. The court has not had any questions about the issues of alleged juror misconduct or the so-called cumulative error issue. We believe the cumulative error issue is a make-weight argument that just tries to find some issue that they can hopefully pull together to raise an issue of error. It's not a significant one. In terms of the issue of alleged juror misconduct, we would point out that, first of all, Juror Lockwood's declaration was excluded by the district court under 606B. That's something that they've had a difficult time addressing. Moreover, the district court pointed out that the question that was asked of the jurors in Gordire was particularly multiple in nature, and under the McDonough test, it wasn't clear that there was even a dishonest answer by the juror in terms of the response. In preparing for argument, I would note that when you ask somebody about cancer, it's conceivable that if the person had actually had a terminal tumor, that the tumor might not be cancerous, that that might be another factor. But in any event, the question was not precise. And secondarily, the second question was, would this have been an appropriate subject for a challenge for cause? We believe not, based in particular on the authorities that we gave the court that said if a person has a background as a victim of sexual assault, just as an example, that per se does not disqualify them from being on a jury dealing with issues relating to sexual assault. So they fail of the McDonough test in terms of any alleged juror misconduct. Thank you, counsel. Thank you, Your Honor. Mr. King, you have some rebuttal time remaining. Critically, what the plaintiffs don't deny is that without Millett, given Dr. Brodkin's admission that exposures that do not exceed ambient range are not causative, without Dr. Millett, they lose. They simply lose. Now, repeatedly the court asked, where are the Daubert findings? The short answer is, they're not there. You can look at all of the orders. There are no express findings about any of these experts saying they're reliable, and here are the reasons, and this evidence is relevant, it fits, and here are the reasons. The court asked, well, why would this happen? I mean, why would we end up with a trial court deciding to admit evidence without doing these determinations? I think the answer is, it's this court's philosophy in the case. I refer, Your Honors, to ER 70. This is page 11 of the Order on Motions and Limiting, just above the discussion of Dr. Millett. The court says, and this is talking about the broader anti-exposure issue, there's obviously a strong divide among both scientists and courts on whether such expert testimony is relevant to asbestos-related cases. In the interest of allowing each party to try its case, the court deems admissible expert testimony that every exposure can cause an asbestos-related disease. That is the antithesis of doing a Daubert analysis. Well, this is a very careful judge. He's a very good judge. I know. I know that, Your Honor. And there's a published opinion out there where this court praised his Daubert work in another case. But you can't deny this record. Now, I should point out. Counsel, let me ask you, there was some question about whether I correctly understood your opening argument with respect to the level of exposure. Are you in agreement or disagreement that levels above the ambient level can be causative? We are in disagreement on that point. But if you resolve this issue on the basis of Millett is out, then you can treat it as a given that levels above ambient are causative and we would prevail because the only evidence of exposures left in the record shows, and the content of this evidence is undisputed, that those exposures didn't exceed ambient range. But we most definitely do not agree that scientists should be allowed any longer to use the ipsy-dixit of pointing to the regulatory statements about no known safe level and on that basis saying, well, it's above ambient, we don't know how much it's above ambient, but we don't have to put forward evidence showing a likelihood that there was a range of this point to this point that's above ambient and there's an historical association with those kinds of exposures. No, we definitely don't agree with that. But right now, Your Honor, we have been focusing on, I think, a narrower way of resolving this case. Now, you also asked, what about extrapolatability? Because we're really pounding the point that Dr. Millett's test is admittedly, was not subject to any scientifically verified extrapolatability. And you're told, well, that's a novel claim and there's a description about how extrapolating from E equals MC squared gets us to the A-bomb in the 1940s. Well, two points. One, as a matter of the law of this circuit, the requirement of valid extrapolatability is not novel. That Schuttle versus General Electric company, we cited it in our brief. It is on point on this issue. Second, the march of science, as the Sixth Circuit, Judge Sutton, I believe, in his Tardaz opinion pointed out, courts are not in the business of blazing scientific trails. Science does that. If you've got an unverified hypothesis, it shouldn't be a matter for evidence. And here we have several problems with a series of assertions about how asbestos fibers behave in felts and the processes that can lead to release. Well, some court has to be the first to admit a scientific theory. Otherwise, new scientific theories would never be admitted as evidence. So that can't be true. No, no. What I'm saying is that you've got to have a demonstration of sound science. It would be the first court to have the demonstration of the sound science. But there's got to be the demonstration of sound science. Let me illustrate the problems with Dr. Millett. One, we're told there was peer review. Well, we know there was a publication in a peer review journal, but as Judge Reed's decision in Valentine for the District of Nevada pointed out, that doesn't constitute evidence of true peer review. There was no evidence of true peer review. We're told Dr. Millett was incredibly qualified. He wrote the book on the tests. Right. He was involved in the EPA protocol development. He followed it in other products. Why didn't he follow the protocol he was responsible for partially developing here? He said, well, I couldn't do it. Well, that's not an excuse. We're told the district court cautioned the jury about Dr. Millett's problems. No. The district court threw it to the jury. And if I may close with this point. This is ER212RT1150. He can try to do something that he may feel helps him extrapolate from that. The other side will say why they disagree with that. You ultimately decide what to do. That is a judge who gave the science issues to the jury. That was wrong. We think that you can make the call and grant us a judgment as a matter of law at this stage under Wisecrown. But at the very least, we need a major redo of these science issues, which were not properly handled at the threshold in this case. Thank you, counsel. We appreciate the arguments of both sides. The case just argued is submitted, and we will be adjourned for this morning's session.
judges: Tashima, Graber, Rawlinson